In my view the clincher should be set aside because of fraud, misrepresentation and undue influence. N.C. Gen. Stat. § 97-17. Additionally, the clincher did not meet the Vernon vs.Mabe test and must be set aside.
Plaintiff entered into a compromise settlement agreement ("clincher") with defendants for his admittedly compensable injury to his right knee. The clincher was approved by the Industrial Commission 5 September 1996. Plaintiff filed a Form 33 requesting the clincher be set aside. The matter was heard before a Deputy Commissioner 20 October 1997. In an Opinion and Award dated 6 July 1998, the Deputy Commissioner denied any relief. Plaintiff filed Notice of Appeal to the Full Industrial Commission pursuant to N.C.G.S. § 97-85.
Plaintiff severely injured his right knee at work resulting in surgery. He was assigned a 40% permanent partial impairment and substantial permanent work restrictions. Defendants had exparte communications with plaintiff's treating physician regarding his limitations. Job descriptions were rejected by the doctor. Defendants then presented to the doctor, again without plaintiff's knowledge or input, highly modified job descriptions tailored specifically to plaintiff. The doctor approved them. Defendant-employer summoned plaintiff to a meeting where he was offered the jobs under threat of having his benefits terminated. Plaintiff refused because he was physically unable to perform the jobs. An adjuster with defendant-carrier notified plaintiff she was filing a Form 24 to terminate his benefits and offered him a $30,000.00 clincher. This constitutes fraud, misrepresentation and undue influence.
Plaintiff did not have a lawyer at the time. Defendants knew plaintiff had not returned to work, knew of his severe restrictions, knew of future medical needs and knew of his dire financial situation. Plaintiff was unaware of hisWhitley and Gupton election rights or of the effect a clincher could have on Social Security benefits. The compensation rate was miscalculated on the face of the clincher, and no Social Security set-off language was included in the clincher. Plaintiff signed the clincher because he thought he had no other option. The Form 24 was withdrawn the same day.
Special Deputy Commissioner Ronnie Rowell expressed concern about the effect of the agreement on plaintiff. He testifiedhe would not have approved it had he known there was an error on its face because it would have representedinsufficient consideration.
Over two years later plaintiff still has not returned to work due to his disability, and his doctors have now informed him he needs total knee replacement surgery.
Plaintiff was assigned work limitations by Dr. Dirschl, an orthopedic surgeon. Dr. Dirschl assigned plaintiff a 40% permanent partial impairment of the right leg. He also assigned numerous permanent restrictions, including no lifting over 30 pounds, no standing over 30 minutes at a time or 4 hours total per working day, no climbing, stooping, or crawling, no squatting, and no carrying objects over 10 pounds.
Thereafter, plaintiff was summoned to a meeting at the office of defendant C.C. Mangum. Present were Debbie Rogers, the insurance carrier's rehabilitation nurse, Jerry Evans, defendant's safety supervisor, and a woman from the office of C.C. Mangum named Jennifer Rhone. Plaintiff was told these modified jobs were available for him. Plaintiff showed them the scar on his knee. Plaintiff indicated he knew C.C. Mangum did not have any jobs within his abilities, and therefore, he did not want to return.
Neither of the two job descriptions provided to plaintiff at the meeting had been discussed between plaintiff and his doctor or between plaintiff and the carrier's rehabilitation nurse before being presented to his doctor. Both of the job descriptions had been modified by lining out specific requirements and typing in additional language. Plaintiff confirmed that there is no job at C.C. Mangum where someone solely operates the roller all day. The roller operator must also perform other job duties.
Around the time of this meeting, plaintiff was told by defendants' adjuster, Brenda Hammond, that his benefits were going to be terminated because he would not accept the jobs contained in the descriptions. Ms. Hammond never discussed other employment. Defendants never provided any retraining or vocational help to plaintiff. No information was provided to plaintiff about his right to choose a wage loss claim. The only information provided by Ms. Hammond regarding his options under the Act was that plaintiff would get benefits based upon the 40% rating of his leg.
At the time of these discussions, plaintiff was behind on his bills and was "living from one workers' comp check to another." Plaintiff told Ms. Hammond this. Ms. Hammond offered plaintiff $30,000.00 to settle his case. This was the first offer made. Plaintiff was concerned about being unable to return to work, so he called Ms. Hammond back to discuss the settlement offer. Ms. Hammond told plaintiff he could call her supervisor Ms. Walker about his concerns. Plaintiff called Ms. Walker and told her the situation. Ms. Walker's exact response was "Grow up and stop being a child and take the money, or you're not going to get what you think you're going to get if you try to hold out."
Plaintiff did not have a lawyer at that time. Plaintiff had previously been told by Mr. Evans, on the day of the meeting at C.C. Mangum, "Be careful if you get a lawyer because you might not get what you think you're going to get in the long run."
A clincher agreement was subsequently prepared by defendants' attorney. Plaintiff had conversations with defendants' attorney regarding the agreement, but was never told about the need for Social Security set-off language.
Plaintiff also had a conversation with Mr. Ronnie Rowell, who was a Special Deputy Commissioner for the Industrial Commission at that time. Plaintiff explained his desperate financial situation to Mr. Rowell and his feeling he had no choice but to accept the settlement offer. Plaintiff did not tell Mr. Rowell about being discouraged by defendants from getting a lawyer. Plaintiff indicated his state of mind at the time the clincher was being discussed was as follows: "I was just out of work, behind in my bills, and I was head of my household, and I had no money coming in, and I was at the end of my rope." Plaintiff ultimately signed the clincher on 12 August 1996. Defendants withdrew their Form 24 the same day.
Mr. Rowell indicated he had serious concerns with the clincher agreement upon review. These included the facts that a 40% disability of the leg is "significant", that plaintiff had not returned to work, that only ten months had passed since the accident, and that there might be extensive future medical expenses and complications.
Mr. Rowell testified that, at the time he reviewed the clincher package, there were no vocational rehabilitation progressreports from Resource Opportunities, Inc. included in the package. Mr. Rowell testified reports dated 19 April, 13 June, and 15 June 1996 indicate plaintiff had "severe" and "ongoing problems" with his injury just prior to clincher discussions. The progress reports also indicate consideration was being given to a total knee joint replacement surgery at the time. Mr. Rowell verified these documents were not included in the clincher package and that they could have had an impact on his decision to approve the clincher.
Mr. Rowell testified he would not have approved the clincher agreement had he known that the compensation rate was incorrectly calculated to yield $333.68 per week instead of the correct $367.12 based on an average weekly wage rate of $550.50, and 40% permanent partial disability of the leg. Mr. Rowell stated unequivocally, "I would not have approved the agreement had I known that there was an error," because it would have resulted in insufficient consideration for plaintiff's particular circumstances. Mr. Rowell was provided with no information from defendants that the job descriptions included in the packet were either available at C.C. Mangum normally or elsewhere in the general economy. He was not aware of plaintiff `s conversations with his employer and representatives of its insurance carrier.
Plaintiff testified the condition of his leg at the time he signed the clincher was the same as it is now. When he attended the meeting at C.C. Mangum, and when he signed the clincher, plaintiff had great difficulty with his leg. His leg would swell, he walked with a limp, he used a cane, and it was difficult for him to stand at all. He was limping and using a cane at the C.C. Mangum meeting.
Deborah Greene Rogers, a medical case manager with Resource opportunities, Inc., testified she received plaintiff's case on referral from C.C. Mangum. Ms. Rogers testified that "early on"Mr. Evans and she "began discussing" plaintiff's condition with Dr. Dirschl. She and Mr. Evans thenmodified the job positions and provided them to Dr. Dirschl for review. (Tp. 108, 110) Dr. Dirschl approved the modified descriptions. Although Ms. Rogers communicated with Dr. Dirschl by letter thereafter, no explanation was offered for the earlier "discussions." Ms. Rogers testified she was present at the meeting with plaintiff at which the return to work job descriptions/offers were presented. She verified that plaintiff stated he did not feel he could return to the jobs "because of his physical limitations." Ms. Rogers also verified that C.C. Mangum does not ordinarily have "modified" jobs.
She testified plaintiff was not involved in any way in identifying and selecting these jobs and that plaintiff did not have an opportunity to discuss these jobs with his doctor. No copies of the letter sent to Dr. Dirschl were even provided to her client, the plaintiff, but copies were provided to the employer and Ms. Hammond, the adjuster.
Mr. Jerry Evans testified he was the risk and safety manager at defendant C.C. Mangum during the times in question. Mr. Evans verified that he was involved in discussions regarding plaintiff's limitations with plaintiff's doctor without plaintiff's presence or authorization, stating "the doctor hadtold us some of the concerns." He also indicated that he was the person who modified the job descriptions. He testified the modifications were made specifically to fit plaintiff'scondition as expressed by Dr. Dirschl.
Mr. Evans verified plaintiff walked with a cane, complained of swelling, and showed the scar on his leg at the meeting. He also confirmed plaintiff expressed concerns about his physical ability to perform the jobs offered and, thus, expressed a desire not to return to work for C.C. Mangum. He also verified that plaintiff was threatened with termination of his benefits if he did not accept the jobs.
Ms. Brenda Hammond testified she was a workers' compensation claims account specialist with defendant insurance carrier St. Paul. Ms. Hammond testified she also contacted plaintiff'sdoctor in the process of investigating plaintiff's claim. Ms. Hammond stated she filed the Form 24 with the Commission to terminate his benefits after she learned of plaintiff's refusal of the modified jobs. She then offered plaintiff the option of a Form 26 for his permanency or $30,000.00 to clincher his case. At that time, Ms. Hammond testified she was aware of Dr. Dirschl's opinion that plaintiff was permanently and severely restricted as to work, that plaintiff might need further surgery, that he had a 40% impairment rating, that plaintiff needed money, and that the jobs offered were highly modified. Yet she filed the Form 24 and made the lowball clincher offer anyway. Plaintiff never made a counter-offer.
Ms. Hammond admitted she received copies of the rehabilitation nurse's progress notes and plaintiff's medical records but never mailed copies to the Industrial Commission. She never mailed plaintiff a copy of the Industrial Commission bulletin. Ms. Hammond also admitted she was aware of North Carolina SupremeCourt decisions that proffered employment not reflecting a person's abilities to compete in the job market are not evidence of earning capacity. However, at no time did she advise plaintiff of the presumption of disability, the election of remedies, his right to a wage loss claim, or the effect of a settlement on Social Security disability benefits.
In Vernon v. Mabe, 336 N.C. 425, 444 S.E.2d 191
(1994), the North Carolina Supreme Court specifically rejected any requirement that the criteria in G.S. § 97-17 be met. In that case, the Court of Appeals was held to have erred in concluding that "there is no requirement . . . that the Commission, in approving a Form 26 Compensation Agreement, determine that the agreement is fair." Specifically quoting fromBiddex v. Rex Mills, 237 N.C. 660, 75 S.E.2d 777 (1953) and Caudill v. Chatham Manufacturing Company,258 N.C. 99, 128 S.E.2d 128 (1962) the Supreme Court noted thatessential fairness is required in any voluntarysettlement, and approval of settlement agreements by the Industrial commission must occur "only after a full investigation and a determination that the settlement is fair and just."
In Vernon, the Supreme Court ruled that a settlement agreement which was based only on an analysis of what the employee would recover under § 97-31 was unfair as a matter of law. The Court held that a settlement agreement made by an injured worker who has reached maximum medical improvement must take into consideration all of his potential remedies, such as § 97-29. This was based on the Court's previous ruling inWhitley v. Columbia Manufacturing Company, 318 N.C. 89,85-96, 348 S.E.2d 336, 340 (1986), which held that G.S. §97-31 was not the exclusive remedy for an employee and, ". . . was not, we believe, intended to mean that the presumptions . . . should be used to the . . . detriment [of the employee who can prove diminished earning capacity]. The purpose of the schedule [in section 31] was to expand, not restrict, the employee's remedy." Vernon, 336 N.C. 425, 444 S.E.2d 191.
Quoting from 3 Arthur Larson, The Law of Workmen'sCompensation § 82.41, the Court noted in Vernon
that:
 [T]he entire compensation system has been set up and paid for, not by the parties, but by the public. The public has ultimately borne the cost of compensation protection in the price of the product, and it has done so for the specific purpose of avoiding having the disabled victims of industry thrown on private charity or public relief. To this end, the public has enacted into law a scale of benefits that will forestall such destitution. It follows, then, that the employer and employee have no private right to thwart this objective by agreeing between them on a disposition of the claim that may, by giving the worker less than this amount, make him a potential public burden.
Thereafter the Supreme Court stated:
 We hold, therefore, that the statute requires, on the part of the Commission, a full investigation and a determination that a Form 26 compensation agreement is fair and just, in order to assure that the settlement is in accord with the intent and purpose of the Act that an injured employee receive the disability benefits to which he is entitled, and, particularly that an employee qualifying for disability compensation under both sections 97-29 and -31 have the benefit of the more favorable remedy.
In determining that the employee did not receive the benefits to which he was entitled, the Vernon court paid particular attention to the possibility that other more favorable benefits might be warranted. The Court noted in Vernon
that the medical report attached to the agreement stated that the plaintiff had sustained a 15 percent permanent partial disability and that the physician did not think plaintiff could return to work. The court held, ". . . thus, plaintiff may have
been entitled to permanent total disability benefits under section 97-29, as well as permanent partial disability benefits based on the 15 percent rating under section 97-31.11" (emphasis supplied). The Court in Vernon also deemed it significant that the Commission made no findings regarding plaintiff's capacity to work (as is the case here). The Court went on to hold, "the full and complete medical report attached to the Form 26 Compensation Agreement between plaintiff and defendants was sufficient evidence upon which the commissioncould have based a conclusion that the agreement was not fair and just and in accord with the intent and purpose of the Act." (emphasis supplied)
The same standard applies to the present case. Viewing the medical records and settlement agreement in the light ofVernon, as well as recent landmark decisions by the appellate courts in the cases of Franklin v. BroyhillFurniture Industries, 123 N.C. App. 200, 472 S.E.2d 382
(1996); Kisiah v. W.R. Kisiah Plumbing, Inc.,124 N.C. App. 72, 476 S.E.2d 434 (1996) ; East v. Baby Diaper Service,Inc., 119 N.C. App. 147, 457 S.E.2d 737 (1995) ; Poe v.Raleigh-Durham Airport Authority, 121 N.C. App. 117,464 S.E.2d 689 (1995) and many other recent decisions, the clincher cannot be said to have been fair or to have reflected the benefits to which Mr. Ratchford was legally entitled.
In the instant case, Ms. Hammond testified she only gave plaintiff two options, a Form 26 based on his permanent partial impairment or a $30,000.00 clincher for release of the entire claim. She also testified the clincher figure was based on only a calculation of what plaintiff could expect to receive under §97-31 for his permanent partial impairment.
The whole of the evidence establishes plaintiff had valid potential entitlements to benefits under both § 97-29 and § 97-30, not just § 97-31. Plaintiff could have been entitled to continuing temporary total disability benefits or permanent total disability benefits under § 97-29. Plaintiff had not returned to work when the clincher was signed. He was entitled to a legal presumption of continuing disability until he actually returned to work. Ashley v. Rent-A-Car Co.,271 N.C. 76, 155 S.E.2d 755 (1967) ; Tucker v. Lowdermilk,233 N.C. 185, 63 S.E.2d 109 (1951); Radica v. Carolina Mills,113 N.C. App. 440, 439 S.E.2d 185 (1994). Defendants would have had the burden of proving ability to earn wages.
The undisputed, certified record of the Industrial Commission includes medical reports from plaintiff's treating physician giving him a 40% permanent disability rating of his leg. InVernon, the Supreme Court found a 15% rating sufficient to raise the specter of permanent total disability. Plaintiff's doctor also had assigned numerous permanent work restrictions directly limiting the type of work plaintiff had always
done, heavy manual labor. These entries were assigned before the clincher agreement was entered into or approved by the Industrial Commission. Plaintiff was never released to work without restrictions. It is also undisputed that his employer attempted to return him to a one-of-a-kind modified job because of his medical restrictions. All of these factors directly address questions of suitable employment under such rulings as Saumsv. Raleigh Community Hospital, 346 N.C. 760, 487 S.E.2d 746
(1997), Peoples v. Cone Mills Corp., 316 N.C. 426,342 S.E.2d 798 (1986), and Dixon v. City of Durham, ___ N.C. App. ___, 495 S.E.2d 380 (1998). Therefore, plaintiff might have proven his right to benefits under § 97-29 substantially surpassing those embodied in the clincher which was based upon § 97-31.
Defendants argued that the question of suitable employment was foreclosed by plaintiff's doctor approving the job descriptions. However, the fact that the job descriptions, obtained by defendants through ex parte communications, were approved by Dr. Dirschl is not dispositive. In the case ofHenler v. Red Bird Cab, I.C. No. 859934, the Full Industrial Commission held: "regardless of the treating physician's opinion, if the worker continues to lose wages due to the injury, he or she is entitled to continue to receive temporary total benefits." Also, physical limitations are only one of the factors to be considered in determining whether employment is "suitable."
Wholly apart from the viability of a § 97-29 claim is plaintiff's possible entitlement to a wage loss claim under §97-30. Plaintiff was assigned severe limitations on his ability to perform the type work to which he was accustomed. Plaintiff had earned relatively good wages ($9.10 per hour) in heavy construction despite his minimal education and training. With the restrictions, it is almost certain that when plaintiff hopefully does return to work, he will have to do so at substantially lower wages (possibly the minimum $5.15 per hour). This leaves open the possibility of a substantial wage loss claim under § 97-30. Neither one of these possibilities were considered in the clincher and plaintiff was not allowed an opportunity to present evidence on these issues at the hearing.
Calculating the value of a wage loss claim under G.S. § 97-30
provides a good illustration of just how unfair the clincher amount of $30,000.00 really was. A clincher reflects an average weekly wage of $550.50 considering the fact that the plaintiff's only skills were in heavy asphalt construction which he was no longer able to do and that even if he could have performed such work, his doctor had restricted him to only eight hours of work per day and he was unable to work the substantial amount of overtime required previously in this employment, plaintiff's loss of wage earning capacity is apparent. Assuming he could have returned to work in suitable employment at $6.00 per hour, yielding a post-injury average weekly wage of $240.00 per week, Mr. Ratchford would have sustained a wage loss of $310.00 per week. Two-thirds of this would yield a Temporary Partial entitlement of $206.68 per week.
Plaintiff's injury occurred on 20 October 1995. The clincher agreement was signed on 12 August 1996. Thus, plaintiff had G.S. § 97-30 entitlement to more than 250 weeks remaining of the 300 week maximum for temporary partial disability benefits. Two hundred weeks at the TPD rate specified above yields G.S. §97-30 benefits in the amount of $51,670.00. This benefit would have been even larger if plaintiff had been employable only at a minimum wage position at $5.15 per hour or, as is likely the case, totally disabled and entitled to his full compensation rate during the period of his disability, plus substantial future medical care expenses. In "strongarming" this injured worker into a clincher agreement for only $30,000.00, defendants evaded exposure to at least $20,000.00 of additional expense. Thus, the agreement could not be considered fair compensation under any circumstances. Further, Mr. Ratchford could not have made an informed decision about any election of benefits under G.S. §97-29, 30 or 31 until he had actually returned to work, because the extent of his wage loss would not be known until that time.
In addition to the fact that the clincher failed to account for plaintiff's other benefit options, the majority failed to make findings regarding plaintiff's capacity to work. As exemplified above, it is virtually impossible to show that the clincher was fair and just without making findings about the potential for other benefit options. The Court in Vernon recognized and used this as justification for setting aside a settlement agreement.
Every requirement set out by the Supreme Court in Vernon v.Mabe has been met. The clincher in this case cannot be said to have been fair and just either at the time entered into or at the time of approval by the Industrial Commission. Defendants' conduct in concealing information from the Commission cannot be condoned.
In this case, defendants admitted failing to provide necessary records to the Industrial Commission at the time the clincher agreement was submitted for approval. They withheld rehabilitation reports from the carrier's rehabilitation nurse, concealed evidence of rejection of the job descriptions by plaintiff's treating physician until they were modified and did not even submit information documenting the fact that the job descriptions had been substantially modified because of plaintiff's severe injury.
The obvious purpose of this was to conceal information which might have resulted in disapproval of the agreement by the Industrial Commission. Mr. Rowell had no way of knowing he was looking at only part of the records available in this case and in the possession of the insurance carrier and employer. Mr. Rowell also had no way of knowing that plaintiff agreed to the clincher agreement under threat of termination of his benefits and in reliance on representations made to him by both the insurance adjuster and employer that the sum being paid was the most he could ever get. This is discussed at length in the direct testimony and was not rebutted by defendants.
The Industrial Commission Rules for Utilization of Rehabilitation Professionals in workers' compensation cases became effective on January 1, 1996. The ex parte
communications concerning plaintiff's limitations and modification of the only jobs the employer could identify occurred after that date. None of this information was revealed to the Industrial Commission at the time the clincher agreement was presented for approval.
For the reasons set forth above, in my view, the majority erred as a matter of law in attempting to apply only G.S. § 97-17 to the evidence in this case. TheVernon court specifically held that the standard to be applied is whether the agreement was "fair and just and in accord with the intent and purpose of the Act, considering plaintiff's entitlement to benefits under N.C.G.S. §§ 97-29.
As has been shown, the clincher in the instant case was not fair to plaintiff. It did not consider all of plaintiff's entitlements to benefits, it had the incorrect compensation rate calculated, and it did not include social security set-off language. Mr. Ratchford has been made a public burden as a result of his improvidently entering into the settlement agreement, failure of the carrier to submit all information, and resulting improvident approval of the agreement by the Industrial Commission under exactly the circumstances described by Professor Larson. Properly applying the Vernon standard — in light of numerous appellate decisions since the settlement agreement was entered into — clearly establishes the clincher was unfair. The appropriate remedy is to set aside the clincher agreement and restore the parties to the status quo ante.
This 27th day of May 1999.
 S/_____________ THOMAS J. BOLCH COMMISSIONER